# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| STEVEN SLAYMAN, | Case No. 1:24-cv-01930 |
| Plaintiff, | |
| v. | **CLASS ACTION COMPLAINT** |
| CONTINENTAL AKTIENGESELLSCHAFT; CONTINENTAL TIRE THE AMERICAS, LLC; COMPAGNIE GÉNÉRALE DES ÉTABLISSEMENTS MICHELIN SCA; COMPAGNIE FINANCIÈRE MICHELIN SA; MICHELIN NORTH AMERICA, INC.; NOKIAN TYRES PLC; NOKIAN TYRES INC.; NOKIAN TYRES U.S. OPERATIONS LLC; THE GOODYEAR TIRE & RUBBER COMPANY; PIRELLI & C. S.P.A.; PIRELLI TIRE LLC; BRIDGESTONE CORPORATION; BRIDGESTONE AMERICAS, INC.; AND DOES 1-100, | **DEMAND FOR JURY TRIAL** |
| Defendants. | |

**Table of Contents**

Page

I.      INTRODUCTION ............................................................................................ 1

II.     JURISDICTION AND VENUE ..................................................................... 2

III.    PARTIES ......................................................................................................... 4

        A.      PLAINTIFF............................................................................................ 4

        B.      DEFENDANTS ..................................................................................... 4

IV.     AGENTS AND CO-CONSPIRATORS ........................................................ 9

V.      FACTUAL ALLEGATIONS ........................................................................11

        A.      Tire Market ..........................................................................................11

                1.      The Production of Tires ............................................................11

                2.      Defendants' Tires Are Interchangeable with Each Other........................ 13

        B.      The Structure and Characteristics of the Tire Market Support the Existence of a
                Conspiracy ........................................................................................... 14

                1.      The Market is Highly Concentrated........................................... 14

                2.      Barriers to Entry are High.......................................................... 15

                3.      The Buy-Side of the Market is Not Highly Concentrated ....................... 16

                4.      Demand for Tires is Inelastic .................................................... 16

                5.      Tires are Commodities ............................................................... 18

        C.      Defendants Effectuated the Conspiracy to Coordinated Prices and Control the
                Supply of Tires during the Class Period ............................................. 18

                1.      Prices for Tires Rose Dramatically ........................................... 18

                2.      Signaling .................................................................................... 20

                3.      Price Coordination Through Revenue Management Software ................ 25

                4.      Defendants Had The Opportunity to Collude at Industry Association
                        Meetings and through Joint Ventures........................................ 27

                5.      Supply Coordination ................................................................. 30

        D.      Government Authorities Conduct Dawn Raids on Defendants ........................... 31

        E.      Defendants are Recidivist Violators of Antitrust Laws............................ 31

VI.     CLASS ACTION ALLEGATIONS ............................................................. 32

VII.    TOLLING OF THE STATUTES OF LIMITATIONS ............................... 35

VIII.   CLAIM FOR RELIEF ................................................................................. 36

        COUNT ONE ............................................................................................... 36

IX.     PRAYER FOR RELIEF............................................................................... 38

X.      JURY TRIAL DEMANDED ....................................................................... 40

Plaintiff Steven Slayman, on behalf of himself and all others similarly situated (the "Class"), upon personal knowledge as to the facts pertaining to himself and upon information and belief and on investigation of counsel as to all other matters, brings suit against Defendants Continental Aktiengesellschaft; Continental Tire the Americas, LLC; Compagnie Générale des Établissements Michelin SCA; Compagnie Financière Michelin SA; Michelin North America, Inc.; Nokian Tyres plc; Nokian Tyres Inc; Nokian Tyres U.S. Operations LLC; The Goodyear Tire & Rubber Company; Pirelli & C. S.p.A.; Pirelli Tire LLC; Bridgestone Corporation; Bridgestone Americas, Inc.; and unidentified Doe Defendants (collectively "Defendants"). Plaintiff and the Class seek injunctive relief, treble damages, costs, attorneys' fees, and other just relief for Defendants' *per se* violations of Sections 1 and 3 of the Sherman Act (15 U.S.C. § 1, 3). Plaintiff demands a jury trial.

## I.    <u>INTRODUCTION</u>

1.    Defendants are the largest tire manufacturers in the world and generate billions of dollars in sales annually.

2.    Beginning no later than January 1, 2020, and continuing until the effects of their anticompetitive conduct have ceased (the "Class Period"), Defendants contracted, combined and/or conspired to fix, raise, maintain or stabilize prices for new replacement tires for passenger cars, vans, trucks and buses (collectively, "Tires") sold in the United States.

3.    Defendants control nearly two-thirds of the global and U.S. markets for Tires, generating billions of dollars in sales annually.

4.    Defendants' conspiracy to fix prices for Tires was motivated by a sharp decrease in demand for Tires during the COVID-19 pandemic.

5.    Defendants effectuated their price fixing conspiracy by, among other means, signaling price increases during earnings calls and other public statements, implementing

revenue management software to facilitate and exchange pricing information, participating in annual industry meetings and coordinating supply reductions to keep prices artificially high.

6.    The European Commission ("EC") is currently investigating Defendants' conspiracy. On January 30, 2024, the EC announced dawn raids at the premises of "companies active in the tyres industry in several Member States."[1] The EC justified its dawn raids over suspicion that these companies "violated EU antitrust rules that prohibit cartels and restrictive business practices," and further announced that it suspected Defendants engaged in illegal price coordination.[2]

7.    As a direct result of Defendants' conspiracy, Plaintiff and the Class purchased Tires from Defendants at artificially inflated prices and were thereby directly injured in their business or property.

## II.    JURISDICTION AND VENUE

8.    Plaintiff brings this antitrust class action lawsuit pursuant to Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15 and 26), to recover treble damages and the costs of suit, including reasonable attorneys' fees, for the injuries sustained by Plaintiff and members of the Class; to enjoin Defendants anticompetitive conduct; and for such other relief as is afforded under the laws of the United States for violations of Section 1 of the Sherman Act (15 U.S.C. §1).

9.    The Court has subject matter jurisdiction under 28 U.S.C. §§ 1331, 1337, and Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15(a) and 26). The Court has jurisdiction

---

[1] European Commission Press Release, Commission carries out unannounced antitrust inspection in the tyres sector (Jan. 30, 2024), available at: https://ec.europa.eu/commission/presscorner/detail/en/ip_24_561.

[2] *Id.*

over Plaintiff's claim for injunctive relief pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26.

10.    This Court has personal jurisdiction over Defendants because they purposefully directed their business activity toward this jurisdiction and had substantial contacts with this jurisdiction, and because Plaintiff's claim for relief arises from and relates to illegal acts committed by Defendants within this jurisdiction. Plaintiff paid unlawful overcharges for Tires and suffered antitrust injury within this jurisdiction.

11.    Venue is proper in this district under 28 U.S.C. §§ 1391(a), (b), (c), and (d), and 15 U.S.C. §§ 15(a) and 22. During the Class Period, Defendants transacted business in this District, and a substantial portion of the activity at issue in this case occurred in this District.

12.    Defendants' conduct alleged herein occurred within the flow of U.S. Commerce and was intended to, and did have a direct, substantial, and reasonably foreseeable effect on the interstate commerce of the United States.

13.    During the Class Period, Defendants manufactured, sold, and shipped tires in a continuous and uninterrupted flow of interstate commerce, which included sales of Tires in this District, advertisement of Tires in media in this District, and employment of sales personnel in this District. Defendants' conduct had and continues to have a direct, substantial, and reasonably foreseeable effect on interstate commerce, including commerce within this District.

14.    No other forum would be more convenient for the parties and witnesses to litigate this case.

3

III.  **PARTIES**

A.  **PLAINTIFF**

15.      Plaintiff, Steven Slayman, is a resident of the State of Alabama. Slayman

purchased Tires directly from Defendants during the Class Period and has paid unlawfully

inflated prices as a result.

B.  **DEFENDANTS**

16.      **Continental Defendants.** Defendant Continental Aktiengesellschaft

("Continental AG)," is a German company with its headquarters at Continental-Plaza 1, D-30175

Hanover, Germany. Continental AG manufactures and sells Tires for cars, trucks, buses, two-

wheel, and specialty segments.[3]  Continental AG has extensive operations throughout the United

States, either directly or through its wholly-owned and controlled subsidiaries and affiliates.

During the Class Period, Continental AG manufactured, sold, and/or imported Tires to

purchasers in the United States and elsewhere, directly and through predecessors, affiliates, and

subsidiaries.

17.      Defendant Continental Tire the Americas, LLC ("Continental U.S.") is a United

States subsidiary of Continental AG incorporated under the laws of Ohio, with its principal place

of business at 1830 MacMillian Park Drive, Fort Mill, SC 29707. During the Class Period,

Continental U.S. manufactured and sold Tires to purchasers in the United States directly or

through predecessors, affiliates, or subsidiaries. Continental AG controls Continental U.S. both

generally and with respect to the conduct of Continental U.S. in furtherance of the unlawful acts

---

[3] Continental AG, 2022 Annual Report at 75, available at: https://cdn.continental.com/fileadmin/
imported/sites/corporate/_international/english/hubpage
s/30_20investors/30_20reports/annual_20reports/downloads/continental_annual_report_2022.

alleged in this Complaint. Continental AG and Continental U.S. are collectively referred to throughout the Complaint as Continental.

18.    **Michelin Defendants.** Defendant Compagnie Générale des Établissements Michelin SCA ("CGEM") is organized under the laws of France with its principal place of business at 23 place des Carmes-Déchaux, 63000 Clermont-Ferrand, France. CGEM manufactures and sell Tires for cars, light trucks, trucks, and specialty vehicles (mining, agriculture and construction, two-wheel and aircraft).[4] CGEM has extensive operations throughout the United States, either directly or through its wholly-owned and controlled subsidiaries and affiliates. During the Class Period, CGEM manufactured, sold, and/or imported Tires to purchasers in the United States and elsewhere, directly and through predecessors, affiliates, and subsidiaries.

19.    Compagnie Financière Michelin SA ("CFM"), is a wholly-owned subsidiary of CGEM that owns most of the Group's Tire manufacturing, sales and research companies outside of France and coordinates their operations.[5] CFM has extensive operations throughout the United States, either directly or through its wholly-owned and controlled subsidiaries and affiliates. During the Class Period, CFM manufactured, sold, and/or imported Tires to purchasers in the United States and elsewhere, directly and through predecessors, affiliates and subsidiaries.

20.    Defendant Michelin North America, Inc. ("Michelin N.A.") is a U.S. subsidiary of CGEM incorporated under the laws of the State of New York with its principal place of business at One Parkway South, Greenville, SC 29615-5022. Michelin designs, manufactures, and sells Tires for every type of vehicle, including airplanes, automobiles, bicycles, earthmovers, farm

---

[4] Michelin 2022 Universal Registration Document, at pg. 286-291; available at: https://www.michelin.com/en/finance/regulated-information/annual-report/.

[5] *Id.*

equipment, heavy-duty trucks, and motorcycles.[6] During the Class Period, Michelin N.A. manufactured and sold Tires to purchasers in the United States directly or through predecessors, affiliates, or subsidiaries. CGEM controls Michelin N.A. both generally and with respect to the conduct of Michelin N.A. in furtherance of the unlawful acts alleged in this Complaint. CGEM, CFM and Michelin N.A. are collectively referred to throughout the Complaint as Michelin.

21. **Defendant Nokian Tyres.** Defendant Nokian Tyres plc ("Nokian plc") is organized under the laws of Finland with its principal place of business at Pirkkalaistie 7, P.O. Box 20, 37101 Nokia, Finland. Nokian Tyres plc is the parent company of the Nokian Tyres Group, which includes subsidiaries worldwide. Nokian Tyres plc develops and manufactures Tires for passenger cars, trucks, and heavy machinery. Nokian plc has extensive operations throughout the United States, either directly or through its wholly-owned and controlled subsidiaries and affiliates. During the Class Period, Nokian plc manufactured, sold, and/or imported Tires to purchasers in the United States and elsewhere, directly and through predecessors, affiliates, and subsidiaries.

22. Defendant Nokian Tyres Inc. ("Nokian Inc.") is a fully owned subsidiary of Nokian Tyres U.S. Holdings Inc., and an indirect subsidiary of Nokian plc. Nokian Inc. produces car and light truck all season Tires and all-weather Tires for consumers in the United States and Canada. During the Class Period, Nokian Inc. manufactured and sold Tires to purchases in the United States directly or through predecessors, affiliates, or subsidiaries. Nokian plc controls Nokian Inc. both generally and with respect to the conduct of Nokian Inc. in furtherance of the unlawful acts alleged in this Complaint.

---

[6] https://www.usTires.org/michelin-north-america-inc

23.    Defendant Nokian Tyres U.S. Operations LLC ("Nokian U.S.") is a fully owned subsidiary of Nokian Tyres U.S. Holdings Inc., and an indirect subsidiary of Nokian Tyres plc. During the Class Period, Nokian U.S. manufactured and sold Tires to purchasers in the United States directly or through predecessors, affiliates, or subsidiaries. Nokian plc controls Nokian U.S. both generally and with respect to the conduct of Nokian U.S. in furtherance of the unlawful acts alleged in this Complaint. Nokian plc, Nokian Inc. and Nokian U.S. are collectively referred to throughout the Complaint as Nokian.

24.    **Defendant Goodyear.**  Defendant The Goodyear Tire & Rubber Company ("Goodyear") is a corporation organized under the laws of the State of Ohio with its principal place of business at 200 Innovation Way Akron, Ohio 44316-0001. Through its worldwide network of aligned dealers and wholesale distributors and its own retail outlets, commercial truck center, Goodyear offers its products for sale to consumer and commercial customers, along with repair and other services.[7] During the Class Period, Goodyear manufactured and sold Tires to purchasers in the United States and elsewhere, directly and through predecessors, affiliates, and subsidiaries.

25.    **Defendant Pirelli.** Defendant Pirelli & C. S.p.A. ("Pirelli & C") is organized under the laws of Italy with its principal place of business at Via Bicocca degli Arcimboldi, 3, 20126 Milano MI, Italy. Pirelli & C designs, manufactures, and distributes Tires for cars, motorcycles, and bicycles.  Pirelli & C has extensive operations throughout the United States, either directly or through its wholly-owned and controlled subsidiaries and affiliates. During the

---

[7] Goodyear, 2020 Annual Report, Introduction, available at: https://corporate.goodyear.com/content/dam/goodyear-corp/documents/annualreports/2020-annual-report.pdf.

Class Period, Pirelli & C manufactured, sold, and/or imported Tires to purchasers in the United States and elsewhere, directly and through predecessors, affiliates, and subsidiaries.

26.     Defendant Pirelli Tire LLC ("Pirelli Tire") is a subsidiary of Pirelli & C incorporated under the laws of Delaware with its principal place of business located at 100 Pirelli Drive Rome, GA 30161. Pirelli Tire maintains sales and marketing offices in New York City, Los Angeles, Detroit, Montreal and Atlanta, and a prestige flagship store in Los Angeles.[8] During the Class Period, Pirelli Tire manufactured, distributed, and marketed original equipment and replacement Tires for export and domestic car/motorcycle applications in the United States directly or through predecessors, affiliates, or subsidiaries. Pirelli & C controls Pirelli Tire both generally and with respect to the conduct of Pirelli Tire in furtherance of the unlawful acts alleged in this Complaint. Pirelli & C and Pirelli Tire are collectively referred to throughout the Complaint as Pirelli.

27.     **Defendant Bridgestone.** Defendant Bridgestone Corporation ("Bridgestone Corp.") is organized under the laws of Japan with its principal place of business at 1-1, Kyobashi 3-chome, Chuo-ku, Tokyo 104-8340. Bridgestone Corporation is the world's largest Tire and rubber company.[9] Bridgestone Corp. has extensive operations throughout the United States, either directly or through its wholly-owned and controlled subsidiaries and affiliates. During the Class Period, Bridgestone Corp. manufactured, sold, and/or imported Tires to purchasers in the United States and elsewhere, directly and through predecessors, affiliates, and subsidiaries.

28.     Defendant Bridgestone Americas, Inc. ("BSAM") is a subsidiary of Bridgestone Corp. incorporated under the laws of Nevada with its principal place of business at 200 4th Ave,

---

[8] https://www.usTires.org/pirelli-Tire-llc.

[9] https://www.usTires.org/bridgestone-americas-inc

Suite 100, Nashville, Tennessee, 37201-2256. BSAM and its subsidiaries develop, manufacture, and market a wide range of Bridgestone, Firestone, and associate brand Tires to address the needs of a broad range of customers, including consumers, automotive and commercial vehicle original equipment manufacturers, and those in the agricultural, forestry and mining industries.[10] BSAM has U.S. manufacturing facilities in Arkansas, Georgia, Iowa, Illinois, North Carolina, Ohio, South Carolina, Tennessee, and Texas.[11] During the Class Period, BSAM manufactured and sold Tires to purchasers in the United States and elsewhere, directly or through predecessors, affiliates, or subsidiaries. Bridgestone Corp. controls BSAM both generally and with respect to the conduct of BSAM in furtherance of the unlawful acts alleged in this Complaint. Bridgestone Corp. and BSAM are collectively referred to throughout the Complaint as Bridgestone.

29.    **DOE Defendants.** DOE Defendants 1–100 are other individuals or entities who engaged in or abetted the unlawful conduct by Defendants set forth in this Complaint. Plaintiff may amend this Complaint to allege the names of additional Defendants as they are discovered.

## IV.    AGENTS AND CO-CONSPIRATORS

30.    The anticompetitive and unlawful acts alleged against the Defendants in this Complaint were authorized, ordered, or performed by Defendants' respective officers, agents, employees, or representatives, while actively engaged in the management, direction, or control of Defendants' business affairs. Defendants are also liable for acts done in furtherance of the alleged conspiracy by companies they acquired through mergers or acquisitions.

31.    Each corporate Defendant's agents operated under the authority and apparent authority of its respective principals.

---

[10] https://www.usTires.org/bridgestone-americas-inc

[11] *Id.*

32.     Each corporate Defendant, through its respective subsidiaries, affiliates, and agents, operated as a single unified entity.

33.     Various persons and/or firms not named as Defendants herein may have participated as co-conspirators in the violations alleged herein and may have performed acts and made statements in furtherance thereof. In particular, individuals or entities providing revenue management or data analytics may have assisted Defendants in exchanging competitively sensitive information and coordinating with Defendants to fix, raise, maintain and stabilize the price of Tires.

34.     When Plaintiff refers to a corporate family or companies by a single name in this Complaint, Plaintiff is alleging that one or more employee or agent of entities within the corporate family engaged in conspiratorial acts on behalf of every company within that family. Because Defendants market themselves as corporate families, individual participants in the conspiratorial acts did not always know the corporate affiliation of their counterparts, nor did recognize the distinction between the entities within a corporate family. Furthermore, to the extent that subsidiaries within corporate families distributed the tire products discussed in this Complaint, these subsidiaries played a significant role in the conspiracy because Defendants wished to ensure that the prices paid for such products would not undercut their pricing agreements. Thus, all Defendant entities within the corporate families were active, knowing participants in the conspiracy to maintain supracompetitive prices.

## V.    FACTUAL ALLEGATIONS

### A.    Tire Market

#### 1.    The Production of Tires

35.    Almost all vehicles with wheels require Tires as a critical component part.[12] Not only are Tires needed for the nearly 9.2 million passenger and commercial vehicles produced in the United States in 2022, or even the almost 13.8 million vehicles sold in the United States in 2022, the U.S. market requires replacement Tires for many of the 286 million vehicles in operation.[13]

36.    Tires are primarily made of rubber compounds. Natural and synthetic rubbers are mixed with other chemicals to create the compound.[14] Some of the mixture is pushed through a die to create specific shapes, such as treads. The rest of the mixture is calendered or pressed into rubber sheets that are cut into the different components of the Tire, including the inner liner, body piles, and belts. After creating the different components of a Tire, the Tire is built from the inside out by wrapping the components around a drum and forcing them together using internal air pressure and rollers applying an outside force. Finally, the Tire is cured by placing the Tire inside a mold and inserting a bladder that inflates to press the Tire into its final shape.

37.    The United States Tire Manufacturers Association ("USTMA") projects total U.S. Tire shipments of 334.2 million units in 2023, compared to 332.0 million units in 2022 and 332.7

---

[12] Trains are the most prominent wheeled vehicle that do not use a Tire.

[13] Statista, Number of vehicles in operation in the United States between 1st quarter 2018 and 1st quarter 2023, available at https://www.statista.com/statistics/859950/vehicles-in-operation-by-quarter-united-states/.

[14] Goodyear, How Are Tires Made?, available at https://www.goodyear.com/en_US/learn/Tire-basics/how-are-Tires-made.html (last visited on February 8, 2024).

million units in 2019.[15] Total revenue for the U.S. replacement Tire market in 2022 hit $61.42 billion.[16]

38.    Each of the Defendants sells billions of dollars of Tires in the United States each year. Michelin reported over $8.7 billion worth of sales in the United States in 2022 an increase from the $6.7 billion in 2021.[17] Goodyear reported $10.7 billion of sales in the U.S. 2022 increasing from $8.5 billion in 2021.[18] While Continental does not break out U.S. sales, it reported Tire sale revenue of $4.4 billion (€4.2 billion) in North America in 2022.[19] Likewise, Bridgestone does not break out its U.S. sales, but reported $15 billion (¥1.99 trillion) in sales to the Americas in 2022.[20] Pirelli reported $1.7 billion (€1.6 billion) in sales in North America in 2022.[21] Finally, Nokian reported net sales of $331.3 million (€314.6 million) in the Americas in 2022.[22]

39.    Defendants sell Tires for use in new cars ("Original Equipment Tires" or "OE" Tires) or as replacement Tires ("Dedicated Replacement Tires"). There are differences between OE Tires and Dedicated Replacement Tires. OE Tires are those Tires that are specified by the

---

[15] U.S. Tire Manufacturers, 2023 Tire Shipment Outlook, available at: https://www.usTires.org/2023-Tire-shipment-outlook (last visited Feb. 8, 2024).

[16] Statista, Size of the U.S. replacement Tire market from 2016 to 2022, by segment, available at: https://www.statista.com/statistics/581639/size-of-the-pneumatic-Tire-market-in-the-us/#:~:text=In%202022%2C%20the%20U.S.%20market,2022%2C%20followed%20by%20truck%20Tires.(last visited on Feb. 8, 2024).

[17] Michelin, Results 2022, at 64.

[18] Goodyear, 2022 Annual Report at 59, available at: https://corporate.goodyear.com/content/dam/goodyear-corp/documents/annualreports/2022%20Annual%20Report.pdf.

[19] Continental, 2022 Annual Report at 149, available at: https://annualreport.continental.com/2022/en/service/docs/annual-report-2022-data.pdf.

[20] Bridgestone Data 2024, at 6, available at: https://www.bridgestone.com/corporate/library/data_book/pdf/BSDATA2024.pdf.

[21] Pirelli, Annual Report 2022, at 72, available at: https://corporate.pirelli.com/var/files2022/EN/PDF/PIRELLI_ANNUAL_REPORT_2022_ENG.pdf.

[22] Nokian, Financial Review 2022 at 8, available at: file:///C:/Users/jalkeg/Downloads/Nokian_Tyres_Financial_Review_2022%20(2).pdf.

vehicle manufacturer and are initially fitted to the vehicle when new. The car manufacturer works with Tire companies to choose a Tire that will meet any number of performance requirements for their brand-new vehicle. The manufacturer selects a Tire that balances ride noise, handling, longevity, and fuel efficiency to achieve the overall characteristics that the vehicle manufacturer believes is important to the end-user.

40.     By contrast, Dedicated Replacement Tires are selected by individual consumers. Again, consumers may look to such characteristics as noise, handling, longevity, and fuel efficiently when purchasing replacement Tires.

### 2.     Defendants' Tires Are Interchangeable with Each Other

41.     Tires are commodity-like products that are interchangeable at the design stage. They are also interchangeable at the replacement stage. Most Tire manufacturers label Tires with the Tire's type, width, aspect ratio, construction type, diameter, load index, and speed rating.[23]

42.     **Type.** The first letter of the Tire code sequence represents the vehicle type. "P" stands for passenger vehicle Tire which includes sedans, coupes, crossover, SUVs, minivans. "LT" represents light trucks and "ST" indicates special trailer Tires.

43.     **Width.** The next three numbers on a Tire correspond with the width of the Tire in millimeters measured from sidewall to sidewall.

44.     **Aspect Ratio.** The aspect ratio follows the Tire width. The aspect ratio is the percentage of the Tire's height to its width where height is measured in millimeters from the edge of the wheel rim to the top of the tread.

---

[23] Firestone, What Do the Numbers on My Tires Mean? (Jul. 31, 2023), available at https://www.firestonecompleteautocare.com/blog/Tires/what-do-numbers-on-Tires-mean/.

45.    **Construction Type.** The letter following the aspect ratio describes the construction type. The most common construction types are "R" meaning the layers run radially across the Tire, "D" for a diagonal or bias ply construction, and "B" where the Tire has a belted bias.

46.    **Wheel Diameter.** After the construction type, the manufacturer lists the wheel diameter, describing the width of the rim upon which the Tire will fit. This is the number used to describe the Tire size.

47.    **Load Index.** The next two to three-digit number describes how much weight the Tire can bear.

48.    **Speed Rating.**  Finally, the Tire indicates the top speed that it is designed to ride.

**B.    The Structure and Characteristics of the Tire Market Support the Existence of a Conspiracy**

**1.    The Market is Highly Concentrated**

49.    A highly concentrated market is more susceptible to collusion and other anticompetitive practices than less concentrated markets.

50.    In 2022, the revenue shares from Defendants Bridgestone, Michelin, and Goodyear made up almost 64 percent of totally industry revenue for the U.S. Tire market.[24]

51.    The remaining 36 percent of the market includes manufacturers such as Continental and Nokian.

---

[24] IBISWorld, Tire Manufacturing in the U.S. (Jan. 2024) at 60.



52.    This concentration makes the tire market more susceptible to cartelization—a smaller group of competitors is better able to solve the coordination and trust problems that can prevent cartel formation or destabilize an existing cartel. A smaller number of negotiators makes it easier for the conspirators to agree on a cartel price, to allocate market shares, to conceal their collusion, to develop enforcement mechanisms, and to detect and punish cheaters.

### 2.    Barriers to Entry are High

53.    A collusive arrangement that raises product prices above competitive levels would, under basic economic principles, attract new entrants seeking to benefit from the supracompetitive pricing. When, however, there are significant barriers to entry, new entrants are much less likely to enter the market. The market for Tires has high barriers to entry.

54.    The primary barriers to entry are brand loyalty, start-up costs associated with Tire manufacturing, and the cost of maintaining research and development facilities. The Tire manufacturing process requires a large facility, expensive machinery, and vast amounts of input materials.

55.    Defendant Nokian recently completed a $360 million manufacturing facility in Dayton, Tennessee.[25] These manufacturing plants need to be close enough to the end consumers to make shipping costs not prohibitive, as Tires are heavy products. Manufacturing plants must either have sophisticated and expensive automation or a large and expensive labor force. Established Tire manufacturers have also erected significant intellectual property protections through patented products.

### 3.    The Buy-Side of the Market is Not Highly Concentrated

56.    While the majority of Defendants customers are independent Tire dealers, Defendants still make hundreds of millions, if not billions of dollars, in revenue from the highly-fragmented consumer market who purchase Tires at Defendants' wholly-owned retail locations.[26]

57.    Auto dealerships, mass merchandisers, warehouse clubs, Tire-company owned-stores and online Tire dealerships provide Defendants with several additional sales outlets.[27]

58.    The fact that the nature of the buy-side of the Tire market is not concentrated is consistent with collusion. With a large number of buyers, each of whom forms a small share of the total marketplace, there is less incentive for cartel members to cheat on collusive pricing arrangements, since each potential sale is small while the risk of disrupting the collusive pricing agreement carries large penalties.

### 4.    Demand for Tires is Inelastic

59.    "Elasticity" describes the sensitivity of supply and demand to changes in one or the other such that demand is "inelastic" if an increase in the price of a product results in only a small decline in the quantity sold of that product, if any, such that customers have nowhere to

---

[25] https://www.nokianTires.com/daytonfactory/

[26] Ibis Word, Tire Manufacturing in the US Industry Report (Jan. 2024) at 36.

[27] *Id.*

turn for alternative, cheaper products of similar quality and so continue to purchase despite a price increase.

60.     For a cartel to profit from raising prices above competitive levels, demand must be relatively inelastic at competitive prices. Otherwise, increased prices would result in declining sales, revenues and profits, as customers purchased substitute products or declined to buy altogether. Inelastic demand is a market characteristic that facilitates collusion, allowing producers to raise their prices without triggering customer substation and lost sales revenue.

61.     Demand for Tires is highly inelastic because there are no close substitutes for these products. Customers must purchase Tires as an essential part of almost every wheeled vehicle, even if the prices are at supra-competitive levels. Likewise, under certain circumstances, a customer may need to replace his Tires, with no choice but to pay supra-competitive prices.

62.     Furthermore, Tires do not compete with other products in the functional sense; consequently, there is no inter-industry competition through cross-elasticities of demand. Since the demand for Tires is derived from the need to use the automobile, buyers cannot be induced to buy more or less of the product in any significant sense through price changes.

63.     Because the price for Tires is highly inelastic, Defendants were able to and did collectively raise prices to supracompetitive levels without losing revenue. For example, Bridgestone America's chief operating officer reported, "We're certainly seeing a red-hot economy that, despite the price increases and inflation, demand still remains quite strong."[28]

---

[28] Tire Business, Rising tire prices affected by several factors (Jul. 8, 2022), available at: https://www.Tirebusiness.com/news/rising-Tire-prices-affected-several-factors

### 5.    Tires are Commodities

64.    Defendants make similar models of Tires for each of the type-categories listed above (all-season, all-terrain, winter/snow, and summer Tires). Within each type-category, Tires do not differ significantly in quality, appearance, or use. As a result, Tire models are functionally interchangeable.

65.    When purchasing a new set of four replacement Tires, consumers can choose almost any brand on the market. Even when consumers are replacing only some of the four Tires, they can use Tires from different brands or models so long as certain features, such as tread depth, are similar.[29] Thus, Tire "producers are not likely to be able to deviate much from the competitive price without losing sales."[30]

66.    When products are interchangeable, the primary way to compete is on the basis of price. The avoidance of price-based competition is the primary motivation for forming a cartel. Thus, cartels are more likely when the participants sell interchangeable products. Where a product like a Tire is interchangeable, economics suggests that cartel behavior is facilitated because, *inter alia*, cartel members can more easily monitor and detect defections from a price-fixing agreement.

### C.    Defendants Effectuated the Conspiracy to Coordinated Prices and Control the Supply of Tires during the Class Period

### 1.    Prices for Tires Rose Dramatically

67.    Defendants acted in concert to fix, raise, maintain and stabilize the price of Tires manufactured, sold, distributed, or imported into the United States. This unlawful agreement in

---

[29] Agota Szabo, Should you be mixing tire (brands) on the same vehicle?, Priority Tire (Jun. 17, 2022), available at: https://www.priorityTire.com/blog/should-you-be-mixing-Tire-brands-on-the-same-vehicle/

[30] *Economic Analysis of the Rubber Tire Manufacturing MACT*, U.S. Environmental Protection Agency (August 2000), at 2-13, https://www.epa.gov/sites/default/files/2020- 07/documents/rubber-Tire-mfg_ip_08-2000.pdf.

restraint of trade began at least as early as January 1, 2020, and continues into the present. Defendants conduct constitutes a horizontal price-fixing conspiracy and violates Section 1 of the Sherman Act.

68.    For most of the 2010s, the price level of tires was stable, changing only by small amounts slowly. Over the last four years, however, the prices of Tires have seen dramatic increases of over 28%,[31] driven by parallel prices increases from the major U.S. Tire manufacturers.



69.    Since at least 2020, Defendants have coordinated price increases to increase their profits. The justifications offered by the Defendants – that their price increases were due primarily to increased input costs, chiefly stemming from the pandemic and the war in Ukraine –

---

[31] U.S. Bureau of Labor Statistics, Producer Price Index by Industry: Tire Manufacturing, Except Retreading: Pneumatic Tires (Including Passenger, Truck, Bus, Tractor, Industrial, and Other Tires) [PCU3262113262110], retrieved from FRED, Federal Reserve Bank of St. Louis; https://fred.stlouisfed.org/series/PCU3262113262110, February 7, 2024.

were pretextual and do not fully account for the significant increases in prices over the Class Period.

70.     ProPublica reported in March 2023 that the average price of Tires had risen 21.4% over a two-year period, 70% higher than core inflation.[32]

### 2.     Signaling

71.     Defendants coordinated price increases and production limitations through public announcements and statements on earnings calls. The coordinated price increases for Tires began in December 2020 when Michelin announced an increase of 5% "due to changing business dynamics in the U.S. market" that would take effect February 1, 2021.[33] During an earnings call for Nokian's 2020 Financial Statement Release, Teemu Kangas-Kärki, the Vice Chair of the Board of Directors, admitted "there is clear pressure to increase prices."[34] A month later, Continental announced its own price hike effective March 1, 2021.[35]

72.     Two and a half months after announcing its first price hike, Michelin announced an 8% price increase.[36] Followed two days later, by Goodyear's announcement that it would also

---

[32] ProPublica, Overinflated: The Journey of Humble Tire Reveals Why Prices Are Still So High (May 3, 2023), available at https://www.propublica.org/article/inflation-Tires-rubber-imports-high-prices.

[33] Motor Tire Dealer, Michelin Will Raise Consumer, Commercial Prices on Feb. 1 (Dec. 19, 2020), available at: https://www.modernTiredealer.com/topic-category/topics/article/11475158/michelin-will-raise-consumer-commercial-prices-on-feb-1-2020-12-19.

[34] Nokian, Financial Statement Release 2020, Transcript (Feb. 9, 2021), available at: https://nokiantyres.studio.crasman.fi/pub/web/attachments/interim_reports/Transcription%20Nokian%20Tyres%20Q4%202022.pdf.

[35] Motor Tire Dealer, Continental Plas Price Hike on PLT Tires (Jan. 6, 2021), available at https://www.modernTiredealer.com/topics/industry-news/article/11474953/continental-plans-price-hike-on-plt-Tires-2021-01-06.

[36] Motor Tire Dealer, Michelin Will Raise Consumer Tire Prices on April 1 (Mar. 1, 2021), available at https://www.modernTiredealer.com/topic-category/topics/article/11473824/michelin-will-raise-consumer-Tire-prices-on-april-1-2021-03-01.

raise prices 8%.[37] Less than a week later, Pirelli announced a price increase of 7%.[38] Rounding

out the month of March, Bridgestone announced a price increase of 8% on March 24, 2021 to be

effective on May 1.[39]

       73.     The price announcements continued rolling out. On May 3, 2021, Goodyear

announced another 8% price hike.[40] Two days later, Continental announced that it would raise

prices.[41] Within a few weeks, Pirelli again announced another price hike of 6% to be effective on

July 1.[42]

       74.     Price increase announcements kept rolling out for the rest of 2021. On August 3,

Michelin announced an 8% price increase to begin September 1.[43] That same day, Nokian

announced that in anticipation of raw material prices that had yet to materialize, it would

increase Tire prices for the second time that year.[44] A week later, Goodyear announced price

---

[37] Motor Tire Dealer, Goodyear to Increase Consumer Tire Prices (Mar. 3, 2021), available at: https://www.modernTiredealer.com/topics/industry-news/article/11473768/goodyear-to-increase-consumer-Tire-prices-2021-03-03.

[38] Motor Tire Dealer, Pirelli Will Raise Prices in U.S. on April 15 (Mar. 9, 2021), available at https://www.modernTiredealer.com/topic-category/topics/article/11473594/pirelli-will-raise-prices-in-us-on-april-15-2021-03-09.

[39] Motor Tire Dealer, Bridgestone to Raise Consumer Tire Prices on May 1 (Mar. 24, 2021), available at https://www.modernTiredealer.com/site-placement/featured-stories/article/11473222/bridgestone-to-raise-consumer-Tire-prices-on-may-1-2021-03-24.

[40] Motor Tire Dealer, Goodyear Plans Another Consumer Tire Price Hike (May 3, 2021), available at https://www.modernTiredealer.com/topics/industry-news/article/11472039/goodyear-plans-another-consumer-Tire-price-hike.

[41] Motor Tire Dealer, Continental Will Raise Consumer Tire Prices in July (May 5, 2021), available at https://www.modernTiredealer.com/topic-category/topics/article/11471940/continental-will-raise-consumer-Tire-prices-in-july-1-2021-05-05.

[42] Motor Tire Dealer, Pirelli Plans Another Price Hike (May 18, 2021), available at: https://www.modernTiredealer.com/topics/industry-news/article/11471596/pirelli-plans-another-price-hike.

[43] Typepress, Michelin announces North America price increases (Aug. 3, 2021) available at: https://www.tyrepress.com/2021/08/michelin-announces-north-america-price-increases/

[44] Nokian, 2021 Q2 Interim Report Transcript (Aug.3, 2021) at 3.

increases for the fourth time in a year.[45] Later that month, Continental announced a third price increase[46] and Pirelli announced a fourth price increase.[47]

75.    Closing out the year, Continental announced price increases that would go into effect in 2022,[48] Michelin announced up to 12% price increases to be effective on January 1, 2022.[49]

76.    Tire manufacturers announced price increases right away in 2022. On January 3, Pirelli announced up to 10% increases effective January 17.[50]  Defendants continued to announce price increases. On March 1, Continental announced price increases.[51] That same day, Michelin announced 5% increases on passenger and light truck replacements Tires and 9% increases on

---

[45] Ratchet & Wrench, Goodyear and Cooper Consumer Tire Prices are Going Up (Aug. 10, 2021), available at: https://www.ratchetandwrench.com/topics/news/article/11463860/goodyear-and-cooper- consumer-Tire-prices-are-going-up-modern-Tire-dealer

[46] Tire Review, Continental Tire Announces Price Increase (Aug. 30, 2021), available at: https://www.Tirereview.com/continental-Tire-announces-price-increase/

[47] Rubber News, Pirelli raising prices for fourth time in 2021 (Aug. 31, 2021), available at: https://www.rubbernews.com/Tire/pirelli-raising-us-Tire-prices-oct-1.

[48] Madeline Winer, Continental Tire Announces Price Increases, Tire Review (Nov. 9, 2021), available at: https://www.Tirereview.com/continental-Tire-announces-price-increase-2/.

[49] PR Newswire, Michelin Implements Price Increase Across Passenger rands and Commercial Offers in North American Market (Dec. 1, 2021), available at:  https://www.prnewswire.com/news-releases/michelin-implements-price-increase-across-passenger-brands-and-commercial-offers-in-north-american-market-301435108.html.

[50] Daneille Hess, Pirelli Announces Price Increases for Car, Light Truck Tires, Tire Review (Jan. 3, 2022), available at: https://www.Tirereview.com/pirelli-price-increases/.

[51] Christian Hinton, Continental Tire Announces Price Increase, Tire Review (Mar. 1, 2022), available at: https://www.Tirereview.com/continental-Tire-announces-price-increase-3/.

motorcycle Tires.[52] The next day, Bridgestone announces a 10% price increase.[53] Later that

month, Pirelli announces its own 10% price increase.[54]

      77.    Price increases continued through the spring of 2022. In mid-April, Continental

announced another price increase[55] and Nokian announced that it had raised prices in all markets

and would continue to do so.[56] On May 2, Michelin announced increases of 5-12%.[57] The next

month, Goodyear followed with an announcement of price increases up to 10%.[58] Pirelli

announced another price increase of up to 10% on May 17.[59] On June 6, Bridgestone announced

up to 10% price increases.[60]

      78.    The next quarter, Bridgestone announced another round of price increases up to

15%.[61]

---

[52] Michelin Priess Release, Michelin Implements Price Increase Across Passenger Brands and Commercial Offers in North American Market (Mar. 1, 2022), available at:
https://michelinmedia.com/pages/blog/detail/article/c/a1155/#:~:text=Tread%20rubber%20and%20%20associated%20supplies,2%2C%202022,

[53] Christian Hinton, Bridgestone Price Increase for Consumer Replacement Tires, Tire Review (Mar. 2, 2022), available at: https://www.Tirereview.com/bridgestone-price-increase-2/.

[54] Christian Hinton, Pirelli Increases Price for Car and Light Truck Tires, Tire Review (Mar. 23, 2022), available at: https://www.Tirereview.com/pirelli-increases-price-for-Tires/.

[55] Tire Business, Conti to raise U.S. Tire prices again (Apr. 19, 2022), available at:
https://www.Tirebusiness.com/news/conti-raise-us-Tire-prices-june-1.

[56] Nokian, 2022 Q1 Interim Report Transcript (Apr. 27, 2022), at 3.

[57] Michelin Press Release (May 2, 2022), available at:
https://michelinmedia.com/pages/blog/detail/article/c/a1176/#:~:text=GREENVILLE%2C%20S.C.%2C%20May%202%2C,commercial%20products%20and%20service%20offers.

[58] Tire Business, Goodyear to raise North America Tire prices July 1 (Jun. 15, 2022), available at:
https://www.Tirebusiness.com/news/goodyear-raise-north-america-Tire-prices-july-1.

[59] Brian Coote, Pirelli to Increase Prices on U.S. PLT Tires, Tire Review (May 17, 2022), available at:
https://www.Tirereview.com/pirelli-increase-prices-plt-Tires/.

[60] Brian Coote, Bridgestone to Increase Consumer Tire Prices in U.S., Canada, Tire Review (Jun. 6, 2022), available at: https://www.Tirereview.com/bridgestone-increase-prices/; https://www.Tirebusiness.com/news/goodyear-raise-north-america-Tire-prices-july-1.

[61] Christian Hinton, Bridgestone Announces Price Increases up to 15% on Select Tires, Tire Review (Sept. 8, 2022), available at: https://www.Tirereview.com/bridgestone-price-increase-3/.

79.    Defendants announced price increase for 2023 in December of 2022. Michelin announced a 9% increase effective January 1.[62] Bridgestone also announced increased pricing to take effect on January 1, 2023.[63]

80.    In the 1st quarter of 2023, Richard J. Kramer, CEO of Goodyear, highlighted that "over the last 2 years, [Goodyear was] up about 30% in revenue per Tire."[64]

81.    Sales volume did not suffer due to price increases. From 2020, the global Tire market increased 18% year over year in 2021 to around $180 billion.[65] By 2022, demand had returned in line with 2019 levels. For example, Continental's sales volume rose by 19.3% in 2022. Their annual report from that year indicates "agreements reached with customers on price adjustments and to offset inflation-related effects had a positive impact on the sales performance of the Automotive group sector."[66]

82.    As ProPublica reported, corporate executives noticed that when they raised prices, consumers continued to purchase their products. These leaders have declared that they will continue to keep prices high.[67] Goodyear's Chief Administrative Officer Darren Wells has reiterated at earnings calls that its "increase in the replacement Tire prices more than offset [Goodyear's] costs."[68]

---

[62] Samuel Grom, Michelin Introduces Price Increases in Canada, U.S., Tire Review (Dec. 13, 2022), available at: https://www.Tirereview.com/michelin-price-increases/.

[63] Samuel Grom, Bridgestone Americas Increases Replacement Tire Prices, Tire Review (Dec. 13, 2022), available at: https://www.Tirereview.com/bridgestone-americas-increased-prices/.

[64] Goodyear, 2023 Q1 Interim Report Earnings Call Transcript (May 5, 2023), available at: https://finance.yahoo.com/news/q1-2023-goodyear-tire-rubber-012653565.html.

[65] Michelin, 2022 Results at 2.

[66] https://annualreport.continental.com/2022/en/service/docs/annual-report-2022-data.pdf (See page 73)

[67] ProPublica, supra note **Error! Bookmark not defined.**.

[68] Goodyear, Q1 2022 Interim Results Earnings Call Transcript (May 6, 2022), available at: https://seekingalpha.com/article/4507956-goodyear-tire-and-rubber-company-gt-ceo-rich-kramer-on-q1-2022-results-earnings-call

83.    Despite Defendants' claims regarding raw material shortages and costs, a spokesman for Bridgestone Tires reported in May 2022 that the company has not experienced any production disruptions. "We monitor all critical raw material sand global logistics closely and do not foresee any impacts to our supply at this time."[69]

84.    During a conference call with investors, Darren Wells confirmed that Goodyear was tracking competitor pricing, "we've got to acknowledge that we've got major competitors who have announced 2 or 3 price increases during calendar year '22. And Goodyear, North America has announced one increase of up to 12% on January 1. Now the announcements of our competitors generally have been in lower amounts, but there have been a couple of them that have been double digits. So we have to acknowledge that. And then if we go back to last year, Goodyear announced 3 price increases of up to 8% during 2021. And our major competitors announced 3 or 4 price increases generally as well, some of which were unspecified in amounts, but most of which were in the mid-single digits. Yes. So those are the announcements that we've seen."[70]

### 3.    Price Coordination Through Revenue Management Software

85.    Price fixing cartels commonly monitor the conduct of the co-conspirators. As noted by a Former Deputy Assistant Attorney General, in the Antitrust Division, Gary R. Spratling, who was responsible for investigating and prosecuting international cartels, cartels "have shared a number of common characteristics."[71] On top of agreed-upon volumes, exchanges

---

[69] Emmet White, How Tire Manufacturers Averted Crisis—And Kept Rolling, Autoweek (May 27, 2022).

[70] Goodyear, Q1 2022 Interim Results Earnings Call Transcript (May 6, 2022), available at: https://seekingalpha.com/article/4507956-goodyear-tire-and-rubber-company-gt-ceo-rich-kramer-on-q1-2022-results-earnings-call.

[71] Gary R. Spratling, Deputy Assistant Attorney General, Antitrust Division, U.S. Department of Justice, ABA's Criminal Justice Section Presentation "Are the Recent Titanic Fines in Antitrust Case Just the Tip of the Iceberg?" (Mar. 6, 1998).

of otherwise competitively sensitive information, and prices charged to customers, a common characteristic among cartels includes "sophisticated mechanisms to monitor and police the agreements."[72]

86.    Through public statements and revenue management software, Defendants monitored their conspiracy. Goodyear's public statements during the Class Period acknowledge that they tracked each other's competitively sensitive pricing and sales information, which is also consistent with the existence of Defendants' unlawful agreement to fix prices. During the 4th Quarter 2021, earnings call, Darren Wells, Chief Administrative Office of Goodyear, explained, "There are 9 competitors that we tend to track, and 7 out of the 9 have announced price increases in the first quarter. And one of the ones who hadn't raised prices right at the end of last year, so we are seeing very consistent pricing across all the significant industry players."[73]

87.    Defendants' efforts to raise prices became more effective through the use of revenue management software.  At an earnings call in 2022, Rich Kramer, president of Goodyear, explained, "Our data analytics enable us to evaluate day-to-day movement in end-market pricing for ourselves and our competitors, giving us a clear picture of where we are relative to the market and maximizing our ability to capture value for our business."[74]

88.    Torqata started as an analytic arm of American Tire Distributors, designed to identify and create efficiencies in Tire distribution. The company was spun off in 2020 with a mission to allow manufacturers, distributors, and retailers to use data-driven analytics in

---

[72] *Id.*

[73] Goodyear, Q4 2021 Interim Results Earnings Call Transcript (Feb. 11, 2022), available at: https://seekingalpha.com/article/4486435-goodyear-tire-and-rubber-companys-gt-ceo-rich-kramer-on-q4-2021-results-earnings-call.

[74] Goodyear, Q1 2022 Interim Results Earnings Call Transcript (May 6, 2022), available at: https://seekingalpha.com/article/4507956-goodyear-tire-and-rubber-company-gt-ceo-rich-kramer-on-q1-2022-results-earnings-call.

improving key areas of business performance. The company's goal is to help its customers quickly respond to market trends to drive more revenue. The company's VP of Business Development, Jill Trotta, has explained that "[m]anufacturers and distributions can capture demand signals to optimize inventory and production."

89.    In its Pricing Insigts, Torqata touts its ability to assist its customers in revenue and inventory management through analysis of competitors' private information:



90.    Lizeo Group sells its Retail Price Pro software to Defendants Bridgestone and Continental. The software allows the Defendants to filter hundreds of lines of pricing data by part number, brand, product, size, and speed rating. It then allows its customers to set a pricing strategy based on competitor prices.

91.    While Defendants may use different revenue management software, all such programs allow Defendants to analyze large data sets of competitor pricing information in real time, allowing Defendants to monitor the conspiracy by ensuring prices remain at supracompetitive levels.

####     4.    Defendants Had The Opportunity to Collude at Industry Association Meetings and through Joint Ventures

92.    Defendants had numerous opportunities to meet and conspire under the guise of legitimate business contacts and to perform acts necessary for the operation and furtherance of

the conspiracy. At least throughout the Class Period, the Tire industry provided ample opportunities for Defendants and/or their parent companies to collude and fix the prices of Tires, through trade association meetings and public communications.

93.    Each of the Defendants is a member of the U.S. Tire Manufacturers Association ("USTMA"). The USTMA is the national trade association for Tire manufacturers that produce Tires in the United States.

94.    Senior executives from each of the Defendants currently serve on the Board of Directors of the USTMA. Alexis Garcin, President and CEO of Michelin North America, serves as USTMA's chairman.

95.    The USTMA holds a number of annual conferences and meetings where Defendants had the opportunity to meet and discuss pricing. For example, the USTMA holds a spring and fall meeting for its board members annually, including on July 29, 2020; October 6, 2021; January 25, 2022; October 6, 2022; April 3–4, 2023; and October 11, 2023. Minutes from these regular meetings are not available to the public.

96.    Defendants also meet annually at the International Tire Exhibition & Conference, which is the largest U.S. conference in the tire industry and attracts executives from all major tire companies.[75]

97.    Defendants Goodyear and Bridgestone serve on the executive committee of the Tire Society, a not-for-profit organization "with the mission to disseminate knowledge and stimulate the innovation of tires as it pertains to tire science, engineering and technology."[76] The

---

[75] Rubber News, ITEC, Tire Society events highlight 'Tire Week in Akron,' (Jul. 28, 2022), available at: https://www.rubbernews.com/news/goodyear-michelin-ustma-speakers-itec-tire-society.

[76] https://www.tiresociety.org/executive-committee/.

Tire Society holds an annual event known as the Conference on Science and Technology.[77]
Alexis Garcin was a keynote speaker at the 41st Conference on Science and Technology in
September of 2022.[78]

98.    Additionally, Defendants are all members of The Tire and Rime Association, Inc.
("TRA"). The group's "primary purpose is to establish and promulgate ***interchangeability***
standards for tires, rims, valves and allied parts." (emphasis added).[79]

99.    Lastly, the Tire Industry Association ("TIA") is a non-profit association that
organizes two industry wide annual events: the Off-the-Road Tire Conference ("OTR") and the
Global Tire Expo ("GTE"). Defendants consistently serve as sponsors at these events. In fact, at
the upcoming 69th annual OTR Conference, Defendants Bridgestone and Continental are
signature sponsors.[80] At the same event, Defendants Michelin, Goodyear and Nokian Tyres are
serving as conference sponsors.[81] Defendant Bridgestone served as a Gold Sponsor at the 2023
GTE.[82]

100.    Furthermore, in 2018, Defendants Goodyear and Bridgestone joined forces to
form TireHub LLC, creating "one of the largest tire distribution joint ventures in the United
States."[83]

---

[77] *Supra* note 75

[78] *Id*.

[79] https://www.us-tra.org/

[80] https://www.tireindustry.org/events/otr/sponsorship/

[81] *Id*.

[82] https://www.tireindustry.org/events/gte/

[83] PR Newswire, Goodyear, Bridgestone Join Forces to Form U.S. National Tire Distributor (Apr. 16, 2018), available at: https://www.prnewswire.com/news-releases/goodyear-bridgestone-join-forces-to-form-us-national-tire-distributor-300630525.html.

101.    As a result of this new joint venture, Defendant Goodyear terminated its distribution relationship with American Tires Distributors ("ATD"). Stuart Schuette, president and CEO of ATD said, "Unfortunately, Goodyear has chosen to force this transition upon all of us, but we'll work closely with you to manage the impacts…***Goodyear is choosing to limit how its customers can purchase and obtain its products***."[84](emphasis added).

### 5.    Supply Coordination

102.    Defendants also began colluding on the supply of Tires in 2020. That year, the global pandemic shut down many countries, causing a 13% reduction in the amount of driving and a 23% decline in replacement Tire rates.[85]

103.    Despite most manufacturers shutting down production for a few months in 2020, there was no shortage of Tires on the market in 2020 due to the decrease in demand. Nonetheless, Defendants ramped up supply to more than make up for the shut downs in production, leading to excess supply in the market by 2022. As a result, Defendants announced decreases beginning that year. Goodyear explained that "in order to address softening industry demand and prevent the buildup of excess inventory, we reduced production in the fourth quarter of 2022 at most of our Tire manufacturing facilities, resulting in a reduction of approximately 3.5 million units compared to production in the fourth quarter of 2021."[86]

104.    Various statements by Defendants executives emphasized that this "capacity discipline" had to be exercised collectively by industry members. As Richard Kramer, [CEO] at Goodyear explained at the 2023 1st Quarter earnings call discussed Goodyear's "focus on

---

[84] *Id.*

[85] Business Wire, Effects of Pandemic Bring Tire Industry to Slow Roll, J.D. Power Finds (Mar. 18, 2021), available at https://apnews.com/article/business-consumer-products-and-services-diseases-and-conditions-retail-and-wholesale-Tire-retail-3f5b8d0a8eef411bbe57549ee4f911a1.

[86] The Goodyear Tire & Rubber Company, Annual Report 2022 (Form 10-K) at 27.

making sure we're not putting too many Tires in inventory that could impact negatively that supply-demand equation." He further noted that "[t]here's a lot of manufacturing capacity in the industry. And like we did with Cooper, we need to think about how we can use that capacity more wisely as we move ahead."

### D.     Government Authorities Conduct Dawn Raids on Defendants

105.    On the morning of January 30, 2024, the European corporate offices of Defendants Michelin, Bridgestone, Continental, Goodyear, Pirelli and Nokian Tyres were raided by the European antitrust authorities as part of an investigation into a suspected price-fixing conspiracy among the Tire manufactures.[87]

106.    Each Defendant has confirmed that their European offices have been raided.[88] Defendant Bridgestone released a public statement describing Bridgestone as a "responsible company that is committed to fair practices and transparency."[89] Unsurprisingly, this statement does not draw any attention to Bridgestone's prior conduct that raised concerns with Department of Justice, state antitrust regulators, and the South African Competition Authority.

### E.     Defendants are Recidivist Violators of Antitrust Laws

107.    The U.S. tire industry for years has been highly concentrated, and there is a history of antitrust violations by tire manufacturers.

108.    In 2008, the South African Competition Authority conducted search and seizure operations at the premises of Bridgestone, Dunlop, and the South African Tyre Manufacturers' Conference ("SATMC").[90] These raids resulted in South African's competition authority issuing

---

[87] European Commission Press Release, *supra* note 1.

[88] Mlex Limited, Bridgestone, Goodyear, Continental, Nokian confirm EU antitrust dawn raids (Jan. 30, 2024).

[89] Samuel Stolton, Tire Firms Hit by EU Raids Over Suspected Price-Fixing Plot, Bloomberg Law (Jan. 30, 2024).

[90] IR Global, Tyresome collusion: tribunal hearing into alleged tyre cartel (Mar. 29, 2022), available at: https://irglobal.com/article/tyresome-collusion-tribunal-hearing-into-alleged-tyre-cartel/.

fines against Goodyear and Continental, while Bridgestone South Africa (Pty) Ltd. escaped a fine after admitting to taking part in the alleged cartel and receiving conditional immunity after filing a leniency application with the regulator.[91]

109.    Bridgestone and Pirelli were also named in a complaint involving a conspiracy to fix, raise, maintain or stabilize prices, rig bids, and allocate markets and/or customers for marine hose in 2018.[92]

110.    In 2014, Bridgestone agreed to plead guilty and pay a $425 million fine for its role in a conspiracy to fix prices of automotive anti0bration rubber partes installed in cars sold in the United States and elsewhere.[93]

111.    In 2019, Defendants Bridgestone and Continental were amongst the 52 automotive suppliers that paid a total of $23 million in settlements for antitrust law violations brought by the California Attorney General.[94]

## VI.    CLASS ACTION ALLEGATIONS

112.    Plaintiff brings this action on behalf of himself and all others similarly situated under Federal Rules of Civil Procedure, Rule 23(a), (b)(2) and (b)(3), seeking damages, and equitable and injunctive relief on behalf of the following class (the "Class"):

> All persons or entities that purchased at least one Tire directly from
> Defendants or any co-conspirators within the United States from at

---

[91] Law360, S. Africa Targets Goodyear, Others in Tire Cartel Case (Sept. 8, 2010), available at: https://www.law360.com/articles/192122/s-africa-targets-goodyear-others-in-Tire-cartel- case?copied=1

[92] *In re Marine Hose Antitrust Litigation*, Case No. 1:08-md-018888-DLG, S.D. Fla.

[93] U.S. Department of Justice, Press Release, Bridgestone Corp. Agrees to Plead Guilty to Price Fixing on Automobile Parts Installed in U.S. Cars (Feb. 13, 2014), available at: https://www.justice.gov/opa/pr/bridgestone-corp-agrees-plead-guilty-price-fixing-automobile-parts-installed-us-cars#:~:text=Bridgestone's%20involvement%20in%20the%20conspiracy,Agent%20in%20Charge%20Stephen%20D.

[94] State of California Department of Justice Press Release, Attorney General Becerra Secures $23 Million in Settlements with Auto Parts Manufactures for Violations of Antitrust Law (Dec. 4, 2019), available at: https://oag.ca.gov/news/press-releases/attorney-general-becerra-secures-23-million-settlements-auto-parts-manufacturers.

least as early as January 1, 2020, until the time that the adverse effects of Defendants' anticompetitive conduct ceased. Excluded from the Class are Defendants and their employees, affiliates, parents, subsidiaries and co-conspirators, whether or not named in this Complaint, as well as all federal governmental entities and instrumentalities of the federal government, states and their subdivisions, agencies and instrumentalities.

113.    The Class is so numerous and geographically dispersed across the U.S. that joinder of all members is impracticable. While the exact number of members of the Class is unknown to Plaintiff at this time, based on the nature of the trade and commerce involved, Plaintiff reasonably believes that there are at least thousands of members in the Class.

114.    Plaintiff's claims are typical of the claims of other members of the Class. Plaintiff's claim arises from the same common course of conduct giving rise to the claims of the Classes, and the relief sought is common to the Classes.

115.    Plaintiff and Class Members were injured by the same unlawful conduct, which resulted in them receiving less in value for Tires than they would have received in a competitive market.

116.    Plaintiff will fairly and adequately protect and represent the interests of the Class. The interests of the Plaintiff are aligned with, and not antagonistic to, the Class.

117.    Questions of law and fact common to the Class Members predominate over questions, if any, that may affect only individual members because Defendants have acted and refused to act on grounds generally applicable to Class Members.

118.    There are questions of law and fact common to the Class that relate to the existence of the anticompetitive conduct alleged, and the type and common pattern of injury sustained as a result thereof, including but not limited to:

1.      Whether Defendants engaged in an agreement, combination, or conspiracy to fix, inflate, maintain, or stabilize the prices paid for Tires during the Class Period;

2.      Whether Defendants engaged in an agreement, combination, or conspiracy to limit the supply of Tires during the Class Period;

3.      Whether such agreements constituted violations of the Sherman Antitrust Act;

4.      The identity of the participants of the alleged conspiracy;

5.      The duration of the conspiracy alleged herein, and the acts performed by Defendants their co-conspirators in furtherance of the conspiracy;

6.      Whether Defendants fraudulently concealed their misconduct;

7.      Whether and to what extent Defendants' anticompetitive scheme inflated prices of Tires above competitive levels;

8.      The nature and scope of injunctive relief necessary to restore competition; and

9.      The measure of damages suffered by Plaintiff and the Damages Class.

119.    Plaintiff is represented by counsel who is experienced and competitive in the prosecution of complex class action antitrust litigation.

120.    Class action treatment is a superior method for the fair and efficient adjudication of the controversy in that, among other things, such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of effort and expense that numerous individual actions would engender. The relatively small damages suffered by individual members

of the Class compared to the expense and burden of individual prosecution of the claims asserted in this litigation means that, absent a class action, it would not be feasible for members of the Class to seek redress for the violations of law herein alleged. Further, individual joinder of all damaged members of the Class is impractical, and the prosecution of separate actions by individual members of the Class would create the risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants. Accordingly, the benefits of proceeding through the class mechanism, including providing injured persons with a method of obtaining redress for claims that are not practicable for them to pursue individually, substantially outweigh any difficulties that may arise in management of this class action.

121.    Defendants acted on grounds generally applicable to the Class, thereby making final injunctive relief appropriate with respect to the Class as a whole.

122.    This class action is superior to other alternatives for the fair and efficient adjudication of this controversy. Prosecuting the claims pleaded herein as a class action will eliminate the possibility of repetitive litigation. There will be no material difficulty in the management of this action as a class action.

123.    The prosecution of separate actions by individual Class members would create the risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

## VII. <u>TOLLING OF THE STATUTES OF LIMITATIONS</u>

124.    Class member purchases of Tires within four years prior to the filing of this Complaint are not barred by the applicable four-year statutes of limitations; the statutes are not required to be tolled for these claims to be actionable.

125.    Plaintiff and the Class did not know and could not have known of Defendants' illegal conduct until the European Commission announced dawn raids in the Tire industry on

January 30, 2024. Before then, Plaintiff and the Class had no reason to believe that they paid prices for Tires that were affected by Defendants' illegal conduct, and thus had no duty until then to investigate the claims set forth in this Complaint. Defendants' secret price-fixing agreements were inherently self-concealing.

126.    Additionally, Defendants engaged in affirmative acts that were designed to mislead and conceal their illegal conduct. For example, Michelin attributed its 12% price increase on passenger and light truck replacement Tires in 2022 to "market dynamics."[95] Goodyear justified its July 1, 2022 price increase on consumer Tires to rising raw-materials and other inflation-impacted costs.[96] Pirelli justified its April 11, 2022 price increase to "changing market conditions."[97]

127.    Accordingly, to the extent that tolling is necessary to advance some or all of the claims alleged by Plaintiff and the Class, the four-year statutes of limitations governing claims under the Sherman Act were tolled at least until January 30, 2024, pursuant to the injury-discovery rule and the doctrine of fraudulent concealment.

## VIII. CLAIM FOR RELIEF

### COUNT ONE

### Violation of the Sherman Act, 15 U.S.C. § 1, 3

### (Against All Defendants)

128.    Plaintiff hereby repeats and incorporates by reference each preceding paragraph as though fully set forth herein.

---

[95] https://www.prnewswire.com/news-releases/michelin-implements-price-increase-across- passenger-brands-and-commercial-offers-in-north-american-market-301435108.html

[96] https://www.Tirebusiness.com/news/goodyear-raise-north-america-Tire-prices-july-1

[97] https://www.Tirereview.com/pirelli-increases-price-for-Tires/

129.    From at least January 1, 2020 until the effects of their unlawful conduct cease, Defendants entered into and engaged in a contract, combination, conspiracy or agreement to unreasonably restrain trade or commerce in violation of Section 1 and 3 of the Sherman Act (15 U.S.C. § 1, 3) by artificially restraining competition with respect to the price and supply of new replacement Tires for passenger cars, vans, trucks and buses sold within the United States.

130.    Defendants' activities constitute a per se violation of Section 1 of the Sherman Act.

131.    In formulating and effectuating this conspiracy, Defendants and their co-conspirators did those things that they combined and conspired to do, including:

(a)    exchanging competitively sensitive information among themselves, with the aim to fix, increase, maintain, or stabilize prices of Tires in the United States and elsewhere;

(b)    participating in meetings and conversations among themselves during which they agreed to charge prices at certain levels, and otherwise to fix, increase, maintain, or stabilize prices of ties in the United States and elsewhere; and

(c)    participating in meetings and conversations among themselves to implement, adhere, and police the agreements they reached.

132.    Defendants' conspiracy had the following effects, among others:

(a)    Price competition in the market for Tires has been restrained, suppressed, and/or eliminated;

(b)    Prices for Tires provided by Defendants and their co-conspirators have been fixed, raised, maintained, and stabilized at artificially high, non-competitive levels throughout the United States and elsewhere; and

(c)    Plaintiff and members of the Class who purchased Tires from Defendants and their co-conspirators have been deprived of the benefits of free and open competition.

133.    Plaintiff and members of the Class have been injured and will continue to be injured in their business and property by paying more for Tires purchased from Defendants and their co-conspirators than they would have paid and will pay in the absence of the conspiracy.

134.    The alleged contract, combination, or conspiracy is a *per se* violation of the federal antitrust laws.

111.    For this conduct, Plaintiff and members of the Class are entitled to treble damages, injunctive relief, and attorneys' fees and costs pursuant to Section 4 of the Clayton Act (15 U.S. Code § 15) and 15 U.S.C. § 26.

## IX.    <u>PRAYER FOR RELIEF</u>

WHEREFORE, Plaintiff requests that the Court enter judgment on his behalf and on behalf of the Class defined herein, by adjudging and decreeing that:

A.    The Court determine that this action may be maintained as a class action under Rule 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure, appoint Plaintiff as a representative of the Class and the undersigned law firms as Class Counsel, and direct that reasonable notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given to each and every member of the Class;

B.    The Court adjudge and decree that the acts of the Defendants are illegal and unlawful, including the agreement, contract, combination, or conspiracy, and acts done in furtherance thereof by Defendants and their co-conspirators be adjudged

38

to have been a *per se* violation of Sections 1 and 3 of the Sherman Act (15 U.S.C. §§ 1, 3);

C.    The Court permanently enjoin and restrain Defendants, their affiliates, successors, transferees, assignees, and other offices, directors, agents, and employees thereof, and all other persons acting or claiming to act on their behalf, from in any manner continuing, maintaining, or renewing the conduct, contract, conspiracy, or combination alleged herein, or from entering into any other contract, conspiracy, or combination having a similar purpose or effect, and from adopting or following any practice, plan, program, or device having a similar purpose or effect;

D.    Judgment be entered against Defendants, jointly and severally, and in favor of Plaintiff and members of the Class for treble the amount of damages sustained by Plaintiff and the Class as allowed by law, together with costs of the action, including reasonable attorneys' fees, pre- and post-judgment interest at the highest legal rate from and after the date of service of this Complaint to the extent provided by law;

E.    Each of the Defendants, and their respective successors, assigns, parent, subsidiaries, affiliates, and transferees, and their officers, directors, agents, and representatives, and all other persons acting or claiming to act on behalf of Defendants or in concert with them, be permanently enjoined and restrained from, in any manner, directly or indirectly, continuing, maintaining or renewing the combinations, conspiracy, agreement, understanding, or concert of action as alleged herein; and

E.      The Court award Plaintiff and members of the Class such other and further relief

as the case may require and the Court may deem just and proper under the

circumstances

## X.      JURY TRIAL DEMANDED

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury of all

claims asserted in this Complaint that are so triable.

Respectfully submitted,

Dated:  March 14, 2024

*/s/ Kevin Landau*
Kevin Landau
Archana Tamoshunas
Evan Rosin
**TAUS, CEBULASH & LANDAU, LLP**
123 William Street, Suite 1900A
New York, NY  10038
Telephone: (212) 931-0704
klandau@tcllaw.com
atamoshunas@tcllaw.com
erosin@tcllaw.com

M. Stephen Dampier
**The Dampier Law Group, P.C.**
11 N. Water St., 10th FL
Mobile, AL  36602
(251) 929-0900
stevedampier@dampierlaw.com

Moira Cain-Mannix
Brian C. Hill
Brian W. Castello
**MARCUS & SHAPIRA LLP**
One Oxford Centre, 35th Floor
301 Grant Street
Pittsburgh, PA  15219-6401
Telephone: (412) 471-3490
cain-mannix@marcus-shapira.com
hill@marcus-shapira.com

*Attorneys for Plaintiff*